Case number 24-1743, Gerard D. Da'vage, Appellant v. District of Columbia Housing Authority, et al. Mr. Chan, Amicus Curiae, Appellant. Mr. Douglas, Bernie, et al. Good morning. Good morning, Your Honors. May it please the Court. My name is Hugum Chan, Amicus Curiae Counsel, and I'm presenting arguments in favor of Pro Se Appellant Gerard Da'vage. I'd like to reserve two minutes for rebuttal. Our collective life experiences should reasonably inform us that when someone accuses another of misusing a credit card, that the accuser also identifies the allegedly unauthorized transactions to the accused so as to allow the latter to respond accordingly. But we're here more than just about unauthorized transactions. Isn't it also about taking a trip to Maryland? Your Honor, that is part of the unauthorized transactions. That's part of the accusations that had occurred in Maryland. But the actual trip or the alleged trip to Maryland, that doesn't form the basis of why the agency was about to terminate Mr. Da'vage. What we're focused on is the list of 26 disputed transactions that were identified in the draft notices of disciplinary action. Mr. Da'vage did not receive procedural due process because DCHA did not, or D.C. Housing Authority, did not identify the disputed transactions underlying its charge of credit card misuse against him. It did not provide him with the underlying evidence of support of that charge, and it did not afford him a meaningful opportunity to respond to the charge. I'll address each of these failures in turn, each of which must result in the reversal or vacater of summary judgment. But you still have notice of generally unauthorized transactions related to a gas card. And so why isn't that broad enough and narrow enough for you to know what is at issue, you know, for a termination? Yes, Your Honor, because this court's precedent has said that in order to have a meaningful opportunity to respond to a charge that leads to a deprivation of a right, the plaintiff has to have notice of what those charges are. But he was given the opportunity to provide receipts. Your Honor, that is the defendant's primary argument. However, it's legally irrelevant that the agency asked for those receipts. The burden of ensuring... If he asks for the receipts, then you can put it together with the transactions. Your Honor, not if Mr. Da'vage doesn't know what receipts he has to turn in, because according to... Well, it's his position, at least from the record from what I could see, that he did turn all of them in. And so he needs to know what those additional disputed transactions are so that he can defend for himself. So, for example, it may be that the other charges were made by somebody else, and there's actually record evidence to support a reasonable inference that someone else may have actually had the credit card and was making the unauthorized transactions. Is it in the record what the terms are in terms of the responsibility of the employee who is given an agency credit card? I mean, it seems to me one... And I haven't seen that argued in this case, but if by issuing an agency card to the employee, the agency and the employee agree that the employee is effectively the guarantor of the use of that card when it's in the employee's possession, that seems to me that would bear on this question. But we don't know anything about that in this record. Sure. Your Honor, I think that's correct. We don't know anything about that, but there's a reasonable inference to be drawn from the record that he may not have had possession of the credit card for these 26 allegedly unauthorized transactions. Are you suggesting some other employee or someone else in the agency or rather someone in his household? I think all of those could be reasonable inferences, but what I can... If the court would like, I can walk through the joint appendix for specific pages. But he was also supposed to turn the credit card in every day, right? Correct. And the record reflects that he did. But that doesn't mean that somebody else didn't take the credit card. And it could have been all without any malicious intent. It could have been a mistake that somebody else checked out the credit card. But on the facts of this record, there's a reasonable inference to be drawn that Mr. DeVos didn't necessarily make all of the alleged disputed transactions. Did he really try to engage with the company with respect to asking for the additional information when he had lots of opportunities when he first learned about all this in November up until the actual date of alleged termination and or resignation? The record doesn't seem to reflect that he did. But again, Your Honor, the burden of ensuring compliance with due process is on the agency. It was incumbent on the agency to inform Mr. DeVos which transactions it deemed as being unauthorized or unsubstantiated with receipts so that Mr. DeVos could meaningfully defend himself and potentially submit any additional receipts that he may not have turned in previously. And then just going back quickly to the charge in Maryland, you earlier were trying to make that some kind of separate issue or something that he was not informed of. Because if he was, that's a yes or no answer. Did you go to Maryland or not? And is Maryland in your district? Well, he wasn't, Your Honor, he wasn't. The charge against him is having disputed unauthorized transactions. So whether he made those unauthorized transactions in Maryland or he made them in D.C., that's not really the point of why they were trying to terminate him. It was the fact that it was a disputed transaction. So in that particular example, it could have been in D.C., that transaction could have taken place in D.C., and the agency still would have charged him with credit card misuse. So you would agree that if Maryland is not his district, he should not be there? That's correct. At least based on this record, that's what I can tell. But again, that shouldn't take away from the point that he didn't have notice as to which transactions were allegedly in Maryland or just more generally unauthorized. Again, defendants have cited no case law that holds that a plaintiff like Mr. DeVage has a responsibility to proactively figure out the factual basis of the actions taken against them or affirmatively request that the government provide him with the evidence in support of those transactions. Let me ask you, Mr. Chan, did Mr. DeVage's resignation, I know it's disputed or there's a question in the briefing as to whether it was voluntary, but did the resignation render him ineligible for a normal grievance process, the fact that he left and was no longer an employee? I think at least based on this record, and it's my understanding from reading it, that it looks like he didn't get those post-termination processes because he wasn't treated as being effectively terminated. And how can we conclude that it wasn't a voluntary termination? I know there's an argument that there was a misrepresentation and what I understand that to be was that the agency expressed an imminence about delivering the notice of termination that was inaccurate. Is that right? Yeah, so in order for this court to remand the reverse or vacate summary judgment and remand for further proceedings, it doesn't have to conclude that there was, in fact, a involuntary resignation. There just has to be a genuine dispute of material fact over it. And certainly the record allows this court to draw that, which is why it would be inappropriate to affirm on that alternative basis. So tell me about that genuine dispute of material fact. Am I right that the asserted misrepresentation was that the agency said on the 22nd, we're going to deliver this termination package to you on the 22nd, and it'll be done, and that therefore Mr. Dabaj was feeling like I need to decide ASAP, and I take it that his, how that he claims that affected him because he wasn't able to get more information. Is that the nature of the misrepresentation? Yes, Your Honor. It's both the, I believe that those are grounds sufficient to support misrepresentation as well as duress under the case law. And in terms of misrepresentation though, the misrepresentation has to be material. It has to be something that had it not been communicated, things might have come out differently for the plaintiff. And I'm not sure I follow what, like the train of reasoning of what would have come out differently had they said, hey, we're going to serve this on you next week, or we're not quite ready, but this is our plan. So I think, Your Honor, the inquiry focuses less on the outcome or the result and more about the process. The case law suggests that the touchstone or the touchstone of the inquiry is about being able to make a voluntary and informed choice. And so even if he would have been given more time and decided to resign, that's not the sort of right lens to look at this inquiry. It's about whether or not he had sufficient amount of time to make an informed decision. Except that, if it had come later, what, I mean, there has to be materiality, right? A misrepresentation can't just be any random misrepresentation. It has to be a misrepresentation that harmed him. And you're saying, well, it harmed him because he didn't have time to get more information. And then the next question is, why is that material? What could he or would he have found out that might have changed his calculus? Your Honor, I see that my time is up. You can continue as long as we have questions. Okay. He, what it prevented him from doing was making an informed choice. So he, for example, couldn't get information about what the financial consequences or hardship would have been if he had decided to stay on the job and decided to challenge, subsequently challenge, his termination. So that. Can you say more what you mean, what financial consequences? So, for example, as a general matter, you know, if you're terminated versus, as opposed to being resigned, it might affect, for example, unemployment, subsequent unemployment benefits. Maybe it affects how your retirement benefits are discharged. Maybe it affects your health insurance benefits. All of those types of benefits that come as a perk of a job. He wasn't able to figure out what the consequences were. But there's no better news that I can think of that he would have gotten than what he was already fearing, which was those would have been in jeopardy. Those would have been, well, he was entitled to learn about the fact that they were informed. Except if what he learned would have absolutely been what he was already assuming, then the punitive misrepresentation is just not material. Well, it's still, well, so I don't know if that's, I would respectfully disagree with that, Your Honor. But the second point would be that the folks that he was getting information from with respect to any sort of job benefits were folks that weren't, that didn't even have full notice of what the charges against him were. And so they couldn't have reliably given him appropriate advice such that he could have made an informed decision as to whether to resign or stay on the job and challenge termination. All right. I have a question for you, and it may take some time. I know you were not the lawyer in district court, but how closely did you review the docket in district court? I would say I did review it, and I'm happy to try to answer any questions. I'm looking at Exhibit 6, which is a notice of disciplinary action. The very month this was going on, Mr. DeBage was stopped from running a red light in Maryland. He had his son in the car with him. He gave, and it's a document in the district court record, several pages notifying him of his rights and so forth, the very month that this was going on. Now, I'm going to ask the other side, why on earth they didn't tell us about this? Because it shows that he knew the whole notice of disciplinary action procedure. He was being subject to it at the very same time as this gas purchasing going on with misuse of the vehicle with his son in it, driving in Maryland when he was supposed to be inspecting houses in southeast Washington. And you don't know anything about that? I don't know the actual underlying basis. I did review that in the record, and I don't perceive that to be necessarily relevant to the issue that we have here. Again, he needed to have notice provided by the agency. But you keep trying to focus this on only gas transactions when one of the allegations is that he was unauthorized to be in Maryland. You keep trying to separate that or turn it into a transaction. Yes. So if, Your Honor, a JA-133-134 and JA-140-141, those are where the two draft notices of disciplinary action are that are relevant to this case. And I don't believe if you read those two particular notices, there's anything mentioned about driving in Maryland as being the cause for why they want to terminate him. It is strictly focused on making unauthorized transactions. So again, even if the Maryland transaction had occurred in D.C., that wouldn't have led to the agency withdrawing their basis for wanting to terminate him. So just so I'm clear, you think that Exhibit 6, which sets out exactly what I have said, is not relevant to this case? No. Because what we are focused on is... As far as notice? As far as notice. Because the notice is... Great. Thank you. I don't have any other questions. Do you have anything? Okay. We'll give you a couple minutes. Mr. Douglas. Good morning. May it please the Court? May I ask you why you did not inform the Court of this official? I believe that we have informed the Court of that. I believe that, Your Honor, if you look at our underlying... Well, it's in our underlying motion for summary judgment. And what that goes to is not the unauthorized transactions. I mean, it's this Court in your brief. Your Honor, I believe we did. We made reference to it because the point we were making about that transaction in Maryland, it goes to whether or not Mr. DeBage understood the grievance process. Yes. And I believe we pointed out that he did understand the grievance process. I believe we pointed out that Mr. DeBage had grieved in the past. He grieved this particular matter. He grieved another matter in which he was up for termination. It's my best recollection that he prevailed. He got three days of suspension or something. He got three days of suspension for that matter, that is, driving in Maryland. With his son, which was against company regulation. He was using the car for personal purposes, and that was against the regulations of DCHA. With respect to what took place in November of 2017... Well, this is November of 2017. Yes, Your Honor, but it's a different incident, and it's not the incident that went to the notice of proposed discipline here. It happened on September 21st of 2017. Yes, Your Honor. And the notice he's getting is November of 2017. Go on with the rest of your argument. Your Honor, before the court is... The intention that Mr. DeBage voluntarily or involuntarily resigned, and the argument focuses upon whether or not he was given notice of what was being investigated. What happened here factually, Your Honor, is this. That in an audit of the October 2017 American Express bill and credit card for which Mr. DeBage had been assigned, there appeared to be several transactions. First, DCHA had a procedure that the use of the credit card had to be logged in and a receipt provided so that in an audit they could compare the receipt to the charges. For the charges that were in October of 2017, there were approximately $332 in charges for which there was no receipt. Mr. DeBage? The question, I have a question about whether... I don't see anything in the record saying that DCHA, well, DCHA did have the credit card receipt or the credit card statement. The American Express statement, yes, they did. So DCHA had that statement, right? And DCHA does not claim that it ever gave a copy of that statement... It did not. ...or the relevant charges or showed a copy of that statement to Mr. DeBage. No, what DCHA states, and I think the record sustains, is that Mr. DeBage was asked to attend a meeting between Mr. Dyer, Ms. Russell, and himself. And he was asked questions about the October 2017 charges. And specifically, he's asked questions about, one, why are there charges in Maryland? The district in which you are basically providing services is in the District of Columbia. There are no units to inspect in Maryland. What are you doing in Maryland getting gas? Two, there are charges on this card, which there are no receipts. You are obligated to provide receipts for each and every transaction. Three... Yeah, okay. Keep going. Three, the amount on the card seems to be very, very high. It's $532, which is higher than the average use in that month or for other persons who were doing the same job, that is, inspecting properties in the District of Columbia. He's asked specifically, did you do charges in Maryland? He says, no, I did not. I didn't do it. He says, he's asked specifically where the other receipts are. He says, I've turned my receipts in.  I guess what I'm thinking is, given that the case law says that an employee is entitled to an explanation of the evidence that puts him on notice and enables him to respond. If my spouse came to me and said, wow, there's all these charges on the visa bill. We talked about all the big spending you've been doing. I would say, I think so. What do you mean? Well, it's $2,000 over a series of 10 transactions. I would be like, if you showed that to me and I could see one was for auto repair, another was for the bookstore where I was buying a gift for our cousins, remember, honey? I don't think any of us would be able in that sort of black box, confronted with that black box statement. There are more charges here that we would be able to jog our memory and say, well, right. Oh, yeah, I did swing up to Georgia Avenue and that wasn't Silver Spring and not in DC where I filled the car. I mean, it just, as a matter of due process, it seems like the key thing would be to provide. And I'm not saying there's not a reason to go into an inquiry and a reason to confront the employee about this. But in terms of what gives the person process, it's hard for me to think that anything short of the statement that, in fact, gave the agency, raised the questions for the agency, would be what the employee would need to be able to say. If I may, let me take the example that you've just given. Not to personalize, but to use it. I come home and I say, I've just gotten the American Express bill for the last month. Okay. Now, there's no reason for you to be in Maryland at all. But yet there is a charge here in Maryland. Showing you the receipt that there's a charge, showing you the statement that there's a charge in Maryland, does you no good. There's a charge in Maryland. Again, you know, driving up Georgia Avenue toward Silver Spring, like, am I in DC? I mean, I just feel like if you're asking someone to confront what is giving you concern, and what about the other charges? And there's one about Maryland. What about the other charges? There are other charges and there's no receipt at all. And you're supposed to provide the receipts. Where are the receipts? So, if they're all, you know, where employee B lives, and that employee, you know, I mean, it just seems like you have in hand the most relevant information that would jog if somebody were not culpable, that would give them a basis for saying either, whoa, that is totally not me, or, oh, my gosh, let me tell you what I think these are about. Well, Your Honor, in terms of what's going on here, and remember, this is a pre-termination issue, and the reasons behind that is you give the person an opportunity to respond. He's specifically asked to respond to the question of having the charges in October 2017. And he does respond. He says, A, I didn't do it. I think I turned in all my receipts. And he's then asked to provide the additional receipts. So, giving him the statement saying, look at this particular day. Do you have a receipt for October the 1st? You are obligated under the DCHA procedures to provide a receipt each and every time you use the card. Right. But his position is, I gave you the receipts, and you're saying, well, that means he's not complied with respect to their charges. And I guess the question is, isn't he entitled to try to explain the charges that you're saying he's responsible for, for which he doesn't have receipts? Unless you're saying the fact that he is the issuee of the card, then just res ipsa loquitur. Everything that flows from that, he's the guarantor of those expenses. I don't hear you making that argument. Well, if I have to, I will. But you haven't made that argument. I've not made that argument. You've seen no policy of the agency on that ground. But it sounds like that's your assumption. No. Whereas, you know, and maybe he was insufficiently vigilant about somebody else having access to the card, or maybe when he turned it in, it was given to somebody else. But he can't even address that. He does not say that, Your Honor. He does not. It's your burden to give him process. I'm giving him process. I'm asking him about the charge. I'm asking him to provide all receipts to me. We say to him at the end of the meeting, we say before the meeting, by way of email, bring the card to us and bring in all receipts. At the end of the meeting, we say, look, we're going to look at the entire transactions that you've had when you've had this card in your possession. And what's said to Mr. DeBodge at that point in time is, you know, you admit you've had the card. You've not turned it in. You violated our procedure. Excuse me, he hasn't turned it in? He is. I thought he said he did turn it in. No, he says he did turn it in, Your Honor. And that is made in his motion for his either his opposition or his motion for summary judgment. He says, I did turn the card in. And let me be. He may have also said that to Mr. Faxon that he had had the card in his possession in all but six or seven times. He did not turn it in. Do you have sites for that? I'm not sure that I know where you're referring to. It would be the, I think would be the facts that affidavit, Your Honor. I do not. That's an affidavit? That's not his affidavit. No, it's not his affidavit. I think, well, excuse me, Your Honor. I think that he does supply an affidavit also. And I'm just not remembering. I'm trying to be very accurate in terms of where it's coming from. I know that in the opposition to the motion for summary judgment, one of his contentions is, I told, I think he says, I told Mr. Faxon that I kept the card. He said something in terms of keeping the card. It's an all for six or seven occasions. You would say he didn't turn it in daily. Our contention, Your Honor, is that, and again, this is a pre-termination proceeding. It's not a proceeding. It's basically DCHA saying to a person, look, we think there's been misuse of the credit card. You don't deny that you've had the credit card in your possession since the time it was issued. At some point in time, there is a denial. He's given, and the issue that I'm having here is that he is told what's an issue. He provides a response. And the issue is, he's not terminating it then. DCHA basically does not do that. So let's be clear about exactly what he is on notice about, and then how he responds to what you put him on notice about, so that we can see if those two match up. And then the next question would be, what do you perceive Loudermill requiring? Because it says that oral notice and an explanation is all that's required. That's correct, Your Honor. We contend, first of all, that there are two key meetings. The first meeting being that among Mr. DeVage, Mr. Dyer, and Ms. Russell. At that meeting, he is put on notice about the charges in Maryland. The charges being that, one, there's a charge in Maryland, in use in Maryland, for which there's no receipt. And the question is, why is there even a charge in Maryland, since it's an issue, since the card is supposed to be used only in the District of Columbia? Two, he's put on notice that there are charges for which there are no receipts at all. Three, he's put on notice that there is an unusual amount of charges. That is, there's got to be some justification for $532 of charges in the month of October, when all you're supposed to be doing is buying gas. Okay, so that's what he's put on notice, I believe, on November the 7th. He is put on notice that DCHA is going to be, in that meeting, he's put on notice that DCHA is going to be looking at all credit card charges from July through the end of October, July 2017 through the end of October. He receives a card in June. He, it's in that meeting in which there's the issue of whether or not he's asked about, he's said, he's told that he has not turned the card in every day. That it's been in his possession since the time the card was issued in June, until he was asked to turn it in. But the fact that there is some evidence that supports the agency's view, doesn't mean there's no factual dispute on that point. So that's, I mean, we're at summary judgment. I'm not saying that no reasonable fact finder could agree with the agency. But when we're in a summary judgment posture, the question is, would any reasonable fact finder have to credit the agency's view over Mr. DeBage's? And Mr. DeBage has said he turned in the card. You're saying he didn't. Why is that not a disputed factual issue for a fact finder? No, the question is whether Mr. DeBage's resignation is voluntary or involuntary. That is also a question. And the issue is whether Mr. DeBage was afforded all the procedural due process that the Constitution requires at this stage. Because what Mr. DeBage is doing, he does not contest the fact that, yes, I have resigned. What he asserts is that you just didn't give me constitutional process. I think what he's asserting is that, but that the misrepresentation was that the agency was ready to serve him with the notice of termination on the Friday, the 22nd of December. And that it turns out, we now know that it actually wasn't ready to do that then. So he's making an averment that the misrepresentation, that rushed him. He couldn't get in touch with people. It was an employee holiday party. And that there was some information that he lacked that, if it hadn't been falsely claimed that it was imminent, that he might have obtained. Is that the way you understand his claim? I'm not asking you to agree with it, but I'm asking you to- No, I don't understand his claim to be a bachelor. I understand his claim to be- What do you understand to be what he is identifying as a punitively material misrepresentation? Well, I understand that he is now asserting the fact that the agency had not reached the final decision. But it said it had. It did not say that, Your Honor. Okay, I'm trying to understand what you're characterizing as your understanding of his claim that there was a material misrepresentation. At best, as I understand it right now, Your Honor, is this. Mr. DeVage is taking a conversation between Mr. Thaxton and Ms. Gillis, and is saying in that conversation, when Mr. Thaxton, in effect, says two things. First of all, or really several. One, I've recommended termination here. And he says to her- Keeping- Thaxton, I'm waiting for one signature. I have all but one signature. And he says, that's what he says to her. And this is with Ms. Gillis, who, as I understand it, understands what the process is. That there has to be at least- that two departments have to sign off on it. And all he's doing right now is just waiting for one department to do that. And he explains to Ms. Gillis that he believes the agency is firm in its conclusion to terminate him, because of the prior grievance and the prior discipline, or really the prior discipline. And the fact that what's at issue here is whether or not there is theft. And under the table of penalties, there is no other discipline that can be imposed. So, why isn't what you just described- they didn't yet have the second signature. Yes. So, they weren't actually ready to serve the notice of termination the following day. They had to get that signature. That's correct. Okay. So, they weren't- they didn't have it all signed, sealed, and delivered. That's his- that's all I understand his claim to be. I'm not saying- But even if- I'm not saying it necessarily gets him where he wants to go. I just- instead of fighting the record on that, I thought- which, you know, includes a disputed material fact- I thought you might respond why that isn't material. Well, it's not material, Your Honor. It's clearly not material in terms of what the resignation here is, because the reasoning behind Mr. Gillis's determination- I'm sorry, Mr. DeVos's decisions to resign, he clearly states that, I'm looking at it, and I'm concerned that they could criminally prosecute me. It has nothing to do with the signature, and as to when the signature is obtained, you know, Mr. Thaxton- I mean, Mr. DeVos is operating under the assumption, again, given by- given to him by Ms. Gillis, that if he resigns, he can avoid any sort of prosecution at all. The idea being, if I resign- the idea being, if I resign, no discipline can- proceeding can be initiated against me. And Mr. DeVos says that. But does he have any post-resignation slash termination rights? Post-resignation? No, because he's resigned.  He says that. Where does he say that? I'm sorry, just wrapping up the- We quote the- his deposition transcript in our brief, in which he basically- which he says that, in which a question is asked of him, you know, about why you're resigning. He says, you know, it's the criminal charges, the possibility of being criminally prosecuted. Okay. Do you have any- You don't know the page site in JA for that, do you? I believe that page site, but- courts and dungeons, I think I'll have in a second. Okay. That's, you know, there's reference- in the brief, there's reference to a joint appendix, page 250, but the deposition testimony that's quoted is- I'm looking for that right now. No, it's not that. It's my questions that they're doing in the deposition. And I don't have that right- the paper for it right now. So I don't want to give the- give a missed site. More importantly, to answer the question that had been posed, Mr. Javage is told that you should not resign. You should wait to see what the charges are that are being presented against you. And once those charges are being presented against you, the union will do all that it can to assist you. I do have a question. All right. Thank you. Thank you. Does Mr. Chan have any time left? All right. Why don't you take one minute? Thank you, Your Honors. I would like to- with the one minute that I have, I'd like to try to address just two issues. First, I want to go back to this Maryland charge because it seems to be- I think it's an exemplary of the issue that we have here, which is just because he's told that there was an allegedly unauthorized transaction in Maryland, that's not enough, right? Because we didn't hear- what I didn't hear my friend on the other side of the aisle say was that there is no reasonable inference to be drawn from this record that someone else had that credit card and could have made charges to it. And so telling him that, hey, there's an unauthorized charge in Maryland doesn't allow him to, for example, track down whether or not he was working on the day that the charge was made in Maryland or whether even, you know, his schedule, you know, took him to homes that were anywhere near the Maryland or D.C. border. And so that is why it's important to give him at least the dates of when these transactions occurred. And that's the same issue with the rest of the transactions. He can't meaningfully defend himself if he doesn't know what the other transactions are. In fact, he was deprived of even the meaningful opportunity to make the defense that somebody else made the unauthorized transactions. And two, with respect to the voluntary or involuntary resignation issue, again, this court should remand to the district court in the first instance because the district court didn't consider it. But even if it wants to address it on the merits, Judge Allard is right that at least with respect to misrepresentation, it was that they told him they were ready to terminate him on December 22nd. They weren't. So that's involuntary resignation with respect to misrepresentation. But there's also a dispute of fact, a dispute of material fact, concerning whether his involuntary resignation was a result of duress, meaning he was under a compressed time frame to decide whether to resign or to stay on the job and be terminated, all while without adequate notice of the dispute of transactions, without counsel, without the benefit of knowing what the financial consequences were and with the prospect of facing criminal charges. So in conclusion, this court should reverse or vacate the entry of summary judgment against Mr. DeVos. All right, Mr. Chan, you are appointed by the court to represent Mr. DeVos. We thank you for your assistance. Thank you.
judges: Henderson; Pillard; Childs